# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 21, 2015

## STATE OF TENNESSEE v. WILLIAM VALENTINE

**Appeal from the Criminal Court for Hamilton County**
**No. 278667      Barry A. Steelman, Judge**

**No. E2014-00522-CCA-R3-CD - Filed April 9, 2015**

Following a jury trial, the Defendant, William Valentine, was convicted of attempted first degree murder, a Class A felony, and aggravated assault, a Class C felony. See Tenn. Code Ann. §§ 39-12-101, -13-102, -13-202. The Defendant was sentenced to sixteen years for the attempted first degree murder conviction and five years for the aggravated assault conviction.[1] In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain the Defendant's conviction for attempted first degree murder; (2) that the trial court erred in denying the Defendant's motion to suppress and allowing the State to cross-examine him regarding statements he made to the police; (3) that the trial court erred in admitting photographs depicting scars on the victim's body from several gunshot wounds when the victim already displayed the scars to the jury during his testimony; (4) that the trial court erred in admitting the victim's medical records; (5) that the trial court erred in admitting a recording of a 911 call made by a witness to the shooting; (6) that the State committed prosecutorial misconduct; (7) that the trial court erred by not allowing the Defendant to testify regarding his opinion of a local nightclub; (8) that the trial court erred by not allowing the Defendant to introduce extrinsic evidence of a prior inconsistent statement made by the victim; (9) that the trial court erred by denying the Defendant's motion for a new trial on the grounds that the victim recanted a portion of his trial testimony; and (10) that the Defendant received ineffective assistance from his trial counsel.[2] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

---

[1]The judgment forms do not indicate whether the sentences were to be served concurrently or consecutively, and the Defendant has failed to include a transcript of the sentencing hearing in the appellate record. However, Tennessee Rule of Criminal Procedure 32(c)(1) states that "[u]nless it affirmatively appears that the sentences are consecutive, they are deemed to be concurrent."

[2]For the purpose of clarity, we have renumbered and reordered the issues as stated by the Defendant in his brief.

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

R. Garth Best, Chattanooga, Tennessee (at motion for new trial hearing and on appeal); Arvin H. Reingold, Chattanooga, Tennessee (at trial); and Jonathan Turner, Chattanooga, Tennessee (at motion for new trial hearing), for the appellant, William Valentine.

Herbert H. Slatery, III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; William H. Cox, III, District Attorney General; and Bret Alexander, Carl Thomson Huskins, and David Schmidt, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND[3]

This case arises from a shooting that occurred outside Riverside Wine and Spirits (Riverside) in Chattanooga, Tennessee. The victim, Marquel Lane, testified that on August 12, 2010, he got a ride from his aunt, Lena Miller, to his father's house. On the way to drop off Mr. Lane, Ms. Miller stopped at Riverside to purchase some alcohol. Mr. Lane testified that Ms. Miller parked her black Honda Civic in front of the liquor store, close to the entrance. Mr. Lane sat in the front passenger seat while Ms. Miller went into the liquor store. According to Mr. Lane, he then saw the Defendant and another man, known as "Magic," pull into the parking lot. The men got out of their car and started walking towards the entrance to the liquor store.

Mr. Lane testified that as the Defendant and Magic were walking towards the liquor store, Magic pointed him out to the Defendant. According to Mr. Lane, the Defendant then walked around the front of Ms. Miller's car to the passenger side door with a gun in his hand, said, "I got this," and "just started shooting." Mr. Lane testified that he heard Ms. Miller call his name from the door of the liquor store. According to Mr. Lane, this caused the Defendant to turn and point the gun "at the door." While the Defendant was turned away, Mr. Lane started to crawl towards the driver side door. Mr. Lane testified that he was shot twice in the back as he was crawling out of the car. Mr. Lane also recalled that Magic "was just standing right there" while the Defendant shot him.

---

[3]This section will discuss only the factual background regarding the Defendant's convictions. The factual background of the Defendant's procedural issues will be discussed in other portions of this opinion.

Mr. Lane testified that once he got out of the car, he "took off running" towards the road. The Defendant chased Mr. Lane, shouting, "Where you going?" Mr. Lane testified that when the Defendant caught up to him, he tried to put the Defendant "in a headlock." According to Mr. Lane, he and the Defendant fell to the ground and the Defendant started hitting him. Mr. Lane testified that the Defendant said, "You [sic] fixing to die[,]" as he hit Mr. Lane. Mr. Lane also testified that he believed the Defendant was striking him with the gun. The Defendant repeatedly asked Mr. Lane where he got "hit at" and told him that he was about to die. Mr. Lane testified that the Defendant held him down until he passed out.

Mr. Lane testified that the next thing he remembered was waking up in an ambulance on the way to the hospital. Mr. Lane testified that he was shot in his chest, "sides," and leg. The State had Mr. Lane raise his shirt and show the jury the scars from the gunshot wounds to his torso. Mr. Lane explained to the jury that he was shot in the right side of his chest, the left and right sides of his abdomen, and his lower back. Mr. Lane further testified that he was shot in his right thigh near his groin. The State also introduced photographs taken shortly before the trial depicting the scars on Mr. Lane's torso. Mr. Lane testified that as a result of his injuries, he had "major surgery" and was in the hospital for "two to three months." However, the medical records admitted by the State only covered a period of fifteen days. According to Mr. Lane, it took him a year "to get back to normal."

Mr. Lane explained to the jury that he first met the Defendant approximately a year before the shooting. Mr. Lane testified that, at that time, the Defendant was dating his girlfriend's cousin. Mr. Lane described an altercation when he and his girlfriend had gotten "into it" and her cousin "wanted [him] to leave." Mr. Lane testified that he told the Defendant, who was also present, to "tell [his] girl to stop tripping." According to Mr. Lane, as he was leaving, the Defendant hit him "with some brass knuckles." Mr. Lane claimed that he and his girlfriend were "just arguing," but he later admitted that he pled guilty to domestic assault for hitting his girlfriend during the incident. Mr. Lane denied threatening to hit the Defendant's girlfriend. Mr. Lane also admitted that the Defendant was not arrested for striking him with the brass knuckles because the police "didn't believe" him.

Mr. Lane testified that about three days before the shooting, he saw the Defendant at a local nightclub. Mr. Lane explained that throughout the night, the Defendant kept smirking and bumping into him. Mr. Lane testified that when he was leaving the nightclub, the Defendant said "some stuff" to him and he "just hit" the Defendant. Mr. Lane claimed that he hit the Defendant "about two times, he fell, and that was it." Mr. Lane denied using brass knuckles on the Defendant or having any other weapons on him that night. Mr. Lane testified that two of his "boys" were with him, but he denied that they "jumped on" the Defendant. Mr. Lane insisted that he was the only person "fighting" the Defendant that night.

Mr. Lane admitted that, at the time of the trial, he was in custody for pending charges of failure to appear, possession of drug paraphernalia, criminal trespass, and a "stop sign violation." Mr. Lane testified that all of the pending charges were misdemeanor offenses and that he had never been convicted of a felony. Mr. Lane further testified that on the night of the shooting, he did not have any weapons with him or in the car. Mr. Lane also testified that he did not say anything to the Defendant before the Defendant started shooting at him. Mr. Lane admitted that he started to open the car door when the Defendant and Magic approached him. Mr. Lane testified that he was going to get out of the car to talk to them, but the Defendant already had the gun out. Mr. Lane denied telling the police that the Defendant did not have the gun while the Defendant was beating him.

Ms. Miller testified that she was inside the liquor store talking to the clerk when she heard approximately five gunshots. Ms. Miller testified that the counter was "almost directly in front of the door" and that she looked out and saw the Defendant with a gun shooting into her car. Ms. Miller saw her "windshield shatter[]" and "the door to the driver's side open." Ms. Miller testified that people inside the liquor store "were telephoning the police" and that the employees "locked the doors . . . so [she] couldn't get out." Ms. Miller testified that she saw the Defendant and Mr. Lane "struggling" in the parking lot and that the Defendant's hand was moving in "a stabbing motion." Ms. Miller further testified that she saw a second man with the Defendant but that she did not see him do anything. After the Defendant fled, Ms. Miller went out to Mr. Lane and saw him bleeding from his nose, mouth, and waist.

Emily Pinner testified that she was working at Riverside on the day of the shooting. Ms. Pinner testified that she "was dealing with a customer" when she heard "some pops" coming from outside. Ms. Pinner recalled that the customer got "pretty hysterical" because of what she saw outside the store. Ms. Pinner looked out the door and saw a car with a broken window. Ms. Pinner testified that she locked the door, tried to keep the customer away from the door, and then called 911. An audio recording of Ms. Pinner's 911 call was played for the jury. Ms. Pinner told the operator that "somebody just got shot out in the parking lot." Ms. Pinner saw the victim on the ground and another man on top of him, kicking him. Ms. Pinner then told the operator, "Somebody is getting hurt very badly." Ms. Pinner described the attacker as a black man, with "long dreadlocks" and driving "a black Blazer."

Sergeant Robert Lewis of the Chattanooga Police Department (CPD) testified that he responded to the shooting. Sgt. Lewis testified that he was one of several officers who stopped a black SUV a short distance from the liquor store. The Defendant was driving the vehicle and was its only occupant. Sgt. Lewis recalled that the Defendant had long dreadlocks, matching Ms. Pinner's description, and that his clothes were covered in blood. Sgt. Lewis testified that he "patted down" the Defendant and found an empty holster "in his

waistband." A search of the Defendant's SUV by CPD officers revealed bloodstains on the driver side door and seat as well as the center console. A pair of brass knuckles was found in the center console. Officers also found two shirts with bloodstains on them in the back of the SUV.

CPD officers recovered a total of six .380 Winchester spent shell casings from inside and around Ms. Miller's car. One shell casing was found outside the car, two were found on the passenger seat, one on the center console, and two on the passenger side floorboard. Two bullet holes were found in the driver side door and another was found on the center console. CPD officers were eventually able to recover two spent bullets from inside the driver side door. There also appeared to be two bullet strikes on the passenger side door "where the rounds had actually impacted the door" and chipped the paint but "did not actually penetrate through the door." CPD officers also found "a small smear of blood" on the driver side seat.

Approximately 150 feet east of Ms. Miller's car in a gravel area, CPD officers found a puddle of blood. Near the puddle the officers found Mr. Lane's shirt with a bullet hole "near the right arm sleeve." Mr. Lane's undershirt also had a bullet hole "near the bottom." Some coins and Mr. Lane's cell phone were also found in the gravel area near his shirt. The Defendant's hands were tested for gunshot residue, but the results were inconclusive. CPD officers did not attempt to collect any fingerprints from the crime scene or any of the evidence collected. The gun used to shoot Mr. Lane was never recovered by the police.

Subsequent testing by Tennessee Bureau of Investigation (TBI) forensic scientists revealed that the blood on the driver side door of the Defendant's SUV had a mixture of genetic material. The major contributor was Mr. Lane while the minor contributor was the Defendant. The blood on the two shirts taken from the back of the Defendant's SUV was determined to belong to the Defendant. The bullets recovered from the driver side door of Ms. Miller's car were determined to have been fired from the same .380 caliber gun. The recovered shell casings bore "the same shape and contour firing pin impression as one another and some similar individual characteristics," but the markings were insufficient to conclusively determine that they had been fired from the same gun.

Patrice Schermerhorn testified that she was the paramedic who responded to the shooting of Mr. Lane. Ms. Schermerhorn testified that when she arrived, Mr. Lane was "laying [sic] on the ground and shot multiple times." Ms. Schermerhorn described Mr. Lane's wounds as "[a]bsolutely" life-threatening. Mr. Lane had three gunshot wounds to his right chest "near and below the nipple," one gunshot wound to "the right flank," three gunshot wounds to his left abdomen, one gunshot wound to his right leg, two gunshot wounds to his back, one gunshot wound to his right buttock, and a "grazing wound" to the left side of his scalp.

Investigator Michael Wenger of the CPD testified that he was the lead investigator in this case. Inv. Wenger testified that he and another investigator spoke with Mr. Lane at the hospital ten days after the shooting. According to Inv. Wenger, during that interview, Mr. Lane was asked if he saw or felt a gun when the Defendant was attacking him after the shooting, and Mr. Lane replied that he did not.

At trial, several people testified on the Defendant's behalf that he regularly attended church, was truthful, and not "a murderer" or violent person. Adolphus Mitchell testified that he worked security at the nightclub on the night of the fight between the Defendant and Mr. Lane. Mr. Mitchell testified that he found the Defendant "getting ganged by six or seven [] guys." According to Mr. Mitchell, the Defendant "was in the fetal position, and [the] guys [were] over him beating him and stomping him." Mr. Mitchell testified that Mr. Lane was standing over the Defendant "beating him with a pair of brass knuckles." Mr. Mitchell testified that he broke up the fight and that the Defendant was bloody and had blood on his clothes. Mr. Mitchell further testified that Mr. Lane came to the nightclub often with the other men and that he suspected that they were in a gang.

The Defendant testified on his own behalf at trial. The Defendant told the jury that he had never been arrested for anything before shooting Mr. Lane. The Defendant stated that he had an associate degree, had been accepted to the city's fire academy prior to the shooting, had attended church for the past seven or eight years, was a greeter at his church, and was currently attending a local seminary. However, the Defendant admitted that he had never actually attended the fire academy and had only started his seminary program after the shooting. The Defendant testified that he owned the gun used to shoot Mr. Lane and that, at the time of the shooting, he had a valid handgun carry permit.

The Defendant testified about his prior altercations with Mr. Lane. The Defendant explained that, a year before the shooting, Mr. Lane had "made attempts to beat" his girlfriend and the Defendant's girlfriend in front of the Defendant. The Defendant testified that one of the women was holding a baby when Mr. Lane attacked her. According to the Defendant, he "defended the women and held [Mr. Lane] until the police got there." The Defendant denied using brass knuckles on Mr. Lane, testifying that he did not "need them." The Defendant further testified that he was not arrested or charged with anything as a result of this altercation with Mr. Lane.

The Defendant testified that he next saw Mr. Lane a few days before the shooting at a local nightclub. According to the Defendant, as he was leaving the club, one of Mr. Lane's friends hit him in the back of the head. The Defendant testified that he turned around and punched his attacker several times before Mr. Lane "came and hit [him] on the face with some brass knuckles." The Defendant claimed that after Mr. Lane hit him, "eight more

people came" and attacked him. The Defendant testified that he was "balled up and they stomped [him] and kicked [him]."

The Defendant testified that the men beat him "pretty bad" and that the bloody clothes found in the back of his SUV after the shooting were the clothes he had worn to the nightclub. The Defendant claimed that after Mr. Lane beat him, he told the Defendant that "he was going to get [the Defendant] again" and not to call the police. Despite the severity of the attack, the Defendant testified that he did not go to the hospital. The Defendant testified that he "didn't hold a grudge" against Mr. Lane for the attack but that he was carrying his gun on the day of the shooting because of the attack. The Defendant testified that he "didn't always carry [his] gun everywhere" and that he did not have it at the nightclub.

The Defendant testified that on the day of the shooting, he had met Magic at Riverside and left his car parked in front of the liquor store while they left in Magic's car. When they returned, Ms. Miller's car was parked next to the Defendant's. The Defendant testified that he did not see Mr. Lane until Mr. Lane started to get out of the car and yelled at him, "Old snitching ass n----r, old b---h ass n----r, I'm fixing to beat your ass." The Defendant claimed that Mr. Lane hit him with the car door. The Defendant admitted that, at that point, Mr. Lane was still sitting in the car, but the Defendant claimed that Mr. Lane "was getting out, trying to attack [him]."

The Defendant described the shooting as follows: "[W]hile [Mr. Lane] was trying to open the door, I just, I stopped the door and then I retrieved my pistol and I shot in it. He was trying to take me. I just defended myself." The Defendant testified that he had never shot at someone before and that he was not trying to kill Mr. Lane. The Defendant claimed that he did not think and just started shooting on instinct. The Defendant testified that he did not "even remember aiming[,] . . . [he] was just shooting." The Defendant further testified that he was shooting at Mr. Lane "to keep him away . . . and keep him in the car." The Defendant claimed that he only fired five or six rounds and then dropped the gun behind Ms. Miller's car.

The Defendant testified that Mr. Lane was able to get out of the car and started running away from him. The Defendant claimed that he decided to chase after Mr. Lane because he "saw those brass knuckles again," just "snapped," and "was just so angry." The Defendant testified that Mr. Lane grabbed his hair and tried to put him in a headlock when he caught up to Mr. Lane. The Defendant denied hitting Mr. Lane with the gun and testified that he "just punched him a couple of times" and they fell to the ground. The Defendant testified that he injured his elbow during the fall. The Defendant further testified that he did not recall saying anything to Mr. Lane as they struggled.

The Defendant testified that he then ran back to his SUV. The Defendant claimed that when Mr. Lane got out of the driver side of Ms. Miller's car, he managed to throw the brass knuckles behind the car. The Defendant testified that when he ran back to his SUV, he picked up the brass knuckles from behind the car to ensure that "nobody else got hit with those brass knuckles." The Defendant claimed that one of his friends picked up his gun and that he did not know where it was or what happened to it. The Defendant testified that he got into his SUV and drove away because he panicked. The Defendant pulled over when stopped by the police and "complied" with their instructions.

On cross-examination, the Defendant admitted that when the police asked him about the shooting, he "blurted out" that he did not shoot Mr. Lane, "but [he] kicked his butt." The Defendant claimed that he lied to the police because he was panicked and "not used to dealing with police." The Defendant also admitted that he may have told the police that he did not know who shot Mr. Lane. The Defendant claimed that he was afraid of Mr. Lane because Mr. Lane was in a gang, was "known to carry guns and weapons," and was "a bad dude." The Defendant insisted that he did not plan to shoot Mr. Lane and that he "wish[ed] it never happened." The Defendant continued, "I want this all behind me so I can move on with my life. I have a great life. Really, I don't deserve to be here for defending myself."

Based upon the foregoing evidence, the jury rejected the Defendant's claim of self-defense and convicted him of attempted first degree murder and aggravated assault. The trial court sentenced the Defendant to an effective sentence of sixteen years. This appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for attempted first degree murder.[4] The Defendant argues that the evidence did not establish "premeditation and deliberation" and that the jury erred in rejecting his claim of self-defense. Specifically, the Defendant alleges that the evidence established that he "did not 'arm' himself with the deliberate and premeditated plan of locating and attempting to kill the victim." The State responds that the evidence was sufficient to sustain the Defendant's conviction for attempted first degree murder.

---

[4]The Defendant does not challenge on appeal the sufficiency of the evidence regarding his aggravated assault conviction.

-8-

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." <u>Id.</u> at 380 (quoting <u>State v. Crawford</u>, 470 S.W.2d 610, 612 (Tenn. 1971)) (internal quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." <u>Dorantes</u>, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." <u>Id.</u> at 380 (quoting <u>Holland v. United States</u>, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." <u>State v. Sisk</u>, 343 S.W.3d 60, 67 (Tenn. 2011).

First degree premeditated murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> [P]remeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotation marks omitted). Criminal attempt, as charged to the jury in this case, occurs when a person acts with the kind of culpability otherwise required for the attempted offense and "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992) (internal quotation marks and citations omitted). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Here, the evidence established that the Defendant and Mr. Lane had engaged in two previous altercations. Both men agreed that Mr. Lane, at the very least, punched the Defendant a few days before the shooting. The Defendant himself testified that, despite his handgun carry permit, he did not always carry his gun with him. The Defendant testified that he was carrying his handgun on the day of the shooting because of his altercation with Mr. Lane. While there was conflicting testimony about whether Mr. Lane spoke to the Defendant or was exiting the car when the Defendant started shooting, the Defendant admitted that Mr. Lane was seated in the car when he started shooting at him. The only evidence that Mr. Lane was armed was the Defendant's testimony that he saw Mr. Lane throw a pair of brass

knuckles, a pair of which was later found in the Defendant's SUV, as he was running from the car.

The Defendant shot at Mr. Lane at least six times, but likely more. Mr. Lane suffered eleven gunshot wounds and was grazed on the top of his head. Mr. Lane testified that the Defendant shot him twice in the back as he was crawling out of the car. After Mr. Lane fled, the Defendant chased him down and attacked him. The Defendant testified that he wrestled Mr. Lane to the ground and punched him. Mr. Lane testified that the Defendant beat him with the gun. Mr. Lane also testified that the Defendant repeatedly told him that he was going to die and wanted to know where he had been shot. Once Mr. Lane passed out, the Defendant fled. The Defendant admitted that one of his friends took the gun and disposed of it. Accordingly, we conclude that there was sufficient evidence to establish the element of premeditation.

With respect to the Defendant's argument that he shot Mr. Lane in self-defense, Tennessee law provides that a person may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2). It is well established, under Tennessee law "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

The Defendant testified that Mr. Lane threatened him and was armed with a pair of brass knuckles. The Defendant claimed that he shot into the car in an attempt to keep Mr. Lane away from him. However, the Defendant admitted that Mr. Lane was sitting in the car when the shooting began. The Defendant fired at least six shots, and Mr. Lane suffered numerous gunshot wounds. The Defendant shot Mr. Lane twice in the back as Mr. Lane was attempting to flee the car. As Mr. Lane attempted to run away, the Defendant chased him and continued to attack him. Mr. Lane testified that he was unarmed and that the Defendant approached him with a gun in his hand, said, "I got this," and "just started shooting." Mr. Lane further testified that the Defendant repeatedly asked him where he got "hit at" and told him that he was about to die. Based upon the foregoing evidence, we conclude that it was well within the province of the jury to reject the Defendant's claim of self-defense.

*II. Motion to Suppress*

The Defendant contends that the trial court erred in denying his motion to suppress and allowing the State to cross-examine him regarding statements he made to the police. The Defendant argues that he made the statements without being advised of his constitutional

rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Therefore, the Defendant concludes, his statements were inadmissible, and the State should not have been allowed to impeach his credibility by asking him about the statements on cross-examination. The State responds that the Defendant waived this issue by failing to file a motion to suppress before trial. See Tenn. R. Crim. P. 12(b)(2)(C). The State further responds that even statements ruled inadmissible in its case-in-chief due to a Miranda violation may be used to impeach a defendant's credibility.

The Defendant filed no pretrial motions in this case. On the first day of trial, while the prospective jurors were "in the hallway" waiting on voir dire to begin, defense counsel informed the trial court that he anticipated that Sgt. Lewis would testify regarding statements the Defendant made during his arrest but prior to being given the Miranda warnings. Defense counsel moved the trial court to rule that the Defendant's statements were inadmissible. One of the prosecutors objected to the Defendant's motion, noting that it should have been raised prior to trial and not on the morning that trial was scheduled to begin. Defense counsel stated that he did not know having untimely raised the issue would waive it, but that he was "trying to raise it" so they did not "have to raise it at the time [Sgt.] Lewis opens his mouth and have to do it then."

The trial court informed defense counsel that Tennessee Rule of Criminal Procedure 12 required that a motion to suppress be made before trial. Defense counsel complained that he was unaware Sgt. Lewis would testify until shortly before trial because the State had given him "a bunch of reports" and "voluminous type things." Defense counsel further complained that "[t]his [was] the first time [they] had an opportunity" for a hearing with Sgt. Lewis. The trial court concluded that "today's the day for the jury trial, not the day for a motion to suppress," but agreed to revisit the issue before Sgt. Lewis testified. The next day, the Defendant filed a brief, written motion to suppress. The issue was taken up several times during the course of the State's case-in-chief. Ultimately, the State decided not to ask Sgt. Lewis about the Defendant's statements or to introduce the cruiser video of the Defendant's arrest, which recorded his statements to Sgt. Lewis.[5]

The State informed the trial court that it intended to use the Defendant's statements for impeachment purposes if the Defendant chose to testify. Defense counsel objected, arguing that "[t]here's no law of the United States Constitution that says [the Defendant's statements could] be used at any time." The trial court overruled the Defendant's objection noting that there was significant case law stating that a defendant's prior inconsistent statement could be used for impeachment purposes regardless of any possible Miranda violation. Over defense counsel's objection, the State asked the Defendant on cross-

_____

[5]The video recording was not included in the appellate record.

examination if he recalled what he said when Sgt. Lewis asked him, "Who did the shooting?" The Defendant responded that he believed he said, "I didn't shoot him[,] but I kicked his butt or something like that." The Defendant also stated that he might have said he did not know who shot the victim or that he "heard the shots but [did not] know who fired them."

Tennessee Rule of Criminal Procedure 12 provides that "a motion to suppress evidence" "must be raised before trial." Tenn. R. Crim. P. 12(b)(2)(C). Rule 12 further provides that "[u]nless the court grants relief for good cause, a party waives any defense, objection, or request by failing to comply with . . . rules requiring such matters to be raised pretrial." Tenn. R. Crim. P. 12(f)(1). As such, the Defendant waived the suppression issue by failing to file his motion prior to trial.

Furthermore, it is well established that "[a] statement that is inadmissible against a defendant in the state's case-in-chief because of a Miranda violation may properly be used for impeachment purposes to attack the testifying defendant's credibility." State v. Harts, 7 S.W.3d 78, 85 (Tenn. Crim. App. 1999) (citing Harris v. New York, 401 U.S. 222, 225-26 (1971)). Nor is there any "requirement that . . . statements ruled inadmissible under Miranda must be truthful in order for them to be available for the limited purpose of impeachment." People v. Gutierrez, 52 P.3d 572, 601 (Cal. 2002). The impeachment value of the Defendant's statements is that they contradicted his trial testimony regardless of their truth and "thereby bore upon the credibility of that testimony." Id. The Defendant testified at trial that he shot Mr. Lane in self-defense, but he told the police that he did not shoot Mr. Lane and did not know who did. Accordingly, we conclude that this issue is without merit.

### III. Photographs of the Victim's Scars

The Defendant contends that the trial court erred in admitting photographs depicting scars on the victim's body from several gunshot wounds when the victim also displayed those scars to the jury during his testimony. The Defendant argues that "the probative value of admitting such photographs was greatly outweighed by the danger of unfair prejudice and the risk of inflaming the jury against the accused" because the "victim had already testified and adequately shown and described his wounds to . . . the jury." The State responds that the photographs were admissible because they were relevant and not overly gruesome.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Accordingly, "'the admissibility of photographs lies within the discretion of the trial court' whose ruling 'will not be overturned on appeal except upon a clear showing of an abuse of discretion.'" State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005) (quoting Banks, 564 S.W.2d at 949). A relevant photograph is generally admissible under Tennessee Rule

of Evidence 402, unless its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

Here, the Defendant was charged with attempted first degree murder and aggravated assault. As such, the photographs were relevant to establish the Defendant's premeditation and intent, as well as to rebut the Defendant's claims that he shot Mr. Lane in self-defense, that he did not aim at Mr. Lane, and was shooting haphazardly at Ms. Miller's car. Additionally, the State was required to prove that Mr. Lane suffered a bodily injury in order to satisfy its burden for the aggravated assault conviction. See Tenn. Code Ann. §§ 39-13-101, -102. Furthermore, this court has previously held that photographs of a victim's injuries are relevant, even if cumulative due to a visual demonstration of the victim's scars, because the photographs depicted the nature of the victim's injuries. State v. Melissa J. Pewitt, No. 01C01-9706-CR-00229, 1998 WL 410883, at *5 (Tenn. Crim. App. July 23, 1998). Accordingly, we conclude that the trial court did not err in admitting the photographs of the Mr. Lane's scars.

## IV. The Victim's Medical Records

The Defendant contends that the trial court erred in admitting the victim's medical records. The Defendant's entire argument regarding this issue is as follows: "The Appellant submits that the trial court's admission of incomplete medical records resulted in a prejudicial effect that outweighed the probative value of admitting such records in their incomplete form." The State responds that the Defendant has waived this issue by failing to support his contention with argument, citation to legal authorities, or appropriate references to the record.

During Mr. Lane's testimony, the State sought to introduce his medical records into evidence. The trial court asked defense counsel if he had any objection. Defense counsel replied, "Well, I don't know, I didn't go through all of them, but some are relevant, some are not relevant." The trial court treated defense counsel's statement as an objection to the relevancy of the medical records and overruled the objection. Mr. Lane testified that he was in the hospital for two or three months after the shooting. On cross-examination, Mr. Lane

admitted that the medical records that had been admitted only covered a period of fifteen days.

On redirect examination, Mr. Lane clarified that while the records only covered a period of fifteen days, he believed he was hospitalized for much longer. At that point, defense counsel complained that the State had represented that the medical records introduced into evidence were Mr. Lane's complete medical records but were representing on redirect examination that they were incomplete. The prosecutor stated that he initially believed the medical records to be complete but that he was unsure if that was true given Mr. Lane's testimony.

We agree with the State that the Defendant has waived full appellate review of this issue. The Defendant has failed to support his contention with any argument beyond the conclusory one-sentence statement provided above. Additionally, the Defendant has failed to supply any citation to legal authority or to the record to support his contention. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Due to the Defendant's waiver of this issue, we examine the issue solely to determine whether plain error review is appropriate.

The doctrine of plain error only applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal quotation marks and brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Plain error review is not appropriate because the Defendant has failed to establish that a clear and unequivocal rule of law has been breached. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Again, the location of Mr. Lane's wounds and the severity

of his injuries were relevant to establish a bodily injury, as well as premeditation and intent. The medical records were also relevant to rebut the Defendant's claim of self-defense.

Additionally, the Defendant has failed to establish that review of this error is "necessary to do substantial justice." Mr. Lane and Ms. Schermerhorn both testified about the nature and severity of Mr. Lane's injuries. Furthermore, defense counsel attempted to impeach Mr. Lane about the length of his hospitalization using the records at issue. Accordingly, we conclude that plain error review is not warranted and that this issue is without merit.

*V. 911 Call*

The Defendant contends that the trial court erred in admitting a recording of a 911 call made by a witness to the shooting. The Defendant argues that admission of the recording "caused the jury to hear some impermissible evidence" and that "there were several issues that should have been clarified before the tape was played for the jury, including any potential Crawford [v. Washington, 541 U.S. 36 (2004)] testimonial type issues, hearsay evidence[,] and potential exceptions." However, the Defendant does not identify exactly what the "impermissible evidence" or issues were. The State responds that the trial court did not abuse its discretion in admitting the recording into evidence.

During Ms. Pinner's testimony, she testified that she called 911 after hearing gunshots and locking the door to Riverside. Ms. Pinner was then asked what her "state of mind" was when she called 911, and she responded that she "became increasingly nervous." Ms. Pinner also testified that she had listened to the recording and identified her "voice on that call." The State then requested to play the 911 call for the jury. Defense counsel made the following statement, "Judge, we would have one question as to relevancy. If they want to play it, that's --." The trial court then stated as follows, "All right. There's an objection apparently as to relevancy. Overruled." The recording was played for the jury. In his motion for new trial, the Defendant framed the issue as follows: "The [trial court] erred in allowing the 911 audio recording to be played over objection by trial counsel."

Generally, "issues raised for the first time on appeal are waived." State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); see also Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Because the Defendant did not raise any issue other than relevancy in the trial court, he has waived review of the vague hearsay and Crawford "type" issues alluded to in his brief. Nor is plain error review of these issues warranted. By failing to specifically identify the hearsay and Crawford "type" issues alleged in his brief, the

Defendant has failed to establish that the issues were not waived for tactical reasons or that a substantial right was adversely affected. Page, 184 S.W.3d at 230.

Regarding the Defendant's relevancy objection, we again note that relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. A determination regarding the relevancy of evidence "is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). Here, the 911 recording was relevant because it corroborated Ms. Miller and Ms. Pinner's testimony, contained Ms. Pinner's contemporaneous description of the assailant, which matched the Defendant, and established how long the attack on Mr. Lane lasted. Accordingly, we conclude that the trial court did not abuse its discretion in finding the 911 recording relevant.

*VI. Prosecutorial Misconduct*

The Defendant contends that the State committed prosecutorial misconduct. The Defendant argues that statements by the prosecutors that items had been given to defense counsel during discovery resulted in defense counsel's "appearing either incompetent in front of the jury, or that he was attempting to sour the jury's opinion of the State." The State responds that the prosecutors did not commit prosecutorial misconduct because they were instructed by the trial court to state that they had provided defense counsel with certain TBI reports. The State further responds that the trial court did not abuse its discretion by instructing the prosecutors to make those statements in front of the jury because of defense counsel's actions during the cross-examination of one of the State's witnesses.

During his cross-examination of Inv. Wenger, defense counsel asked Inv. Wenger about the shirts found in the back of the Defendant's SUV. Defense counsel asked Inv. Wenger if the shirts had been sent to the TBI for DNA and gunshot residue testing. Inv. Wenger testified that he had the shirts tested for both. The following exchange then occurred:

[Defense counsel]: Okay. Was any gunshot residue on [the shirts]?

[Inv. Wenger]: I don't have the results.

[Defense counsel]: Well, can you get the results?

[Inv. Wenger]: Yes, sir. I'm sure that it's in the master case file as well as the TBI agent's file.

[Defense counsel]: Would somebody have the results at the [CPD] or the [District Attorney's] office?

[Inv. Wenger]: I believe the D.A.'s office has it with them, I would assume.

Defense counsel asked Inv. Wenger similar questions about the TBI report regarding the DNA analysis of the shirts. Defense counsel then said, "But apparently the results of that test was [sic] not significant enough in the prosecution of this case for you to have the results here today; is that correct?"

At that point, the State objected. The following exchange then occurred during a bench conference:

[Prosecutor 1]: The objection is, we've provided him with all the results that we have from this officer. We've made copies of the disks. I'm, I guess, a little confused as to what he's claiming that he doesn't have, because he, he's making it sound like we're not providing discovery. I just want to make sure I understand what it is that he's claiming he doesn't have.

[Defense counsel]: It's whatever, it's -- I'm entitled for this officer -- it's their results, their tests. I don't have access to the TBI. I want somebody to -- if the TBI --

[Trial court]: Well, if there's anything that you have, that you actually already have, then the Court does not believe you should ask the witness about whether he brought it as if you have never seen it.

[Defense counsel]: I want this witness to introduce the results of those tests, Judge. I have that right to introduce those tests that were conducted.

[Prosecutor 2]: He has no right to mischaracterize, --

[Defense counsel]: Excuse me, I was talking.

[Prosecutor 2]: -- acting like he doesn't have it. That is a mischaracterization.

[Trial court]: All right.

-18-

[Prosecutor 1]: And I would add one last comment, which is, all these comments about "in the D.A.'s office," "ought to have it" is his way of trying to tell the jury that we're not providing discovery or hiding something.

[Defense counsel]: It's not --

[Prosecutor 1]: And that's my concern as well.

[Defense counsel]: It's not a question if it's provided to me; it's a question they have it and I want to introduce. I can't introduce it. I can't bring the TBI. Can I take the stand and say --

[Trial court]: If you could show it to this witness and ask him if he recognizes it and introduce it.

[Defense counsel]: It's not my job to show him tests that they've conducted, Judge. I want him to bring those tests in. It's not my job to say, "Is this the result of the TBI test?"

[Trial court]: Well, you have them though. I'm going to allow the State, when you do that, to say, "We've given it to [defense counsel]."

[Defense counsel]: And if I have them, they have them.

[Trial court]: So if you want to say that at this time, I'll allow you to say that, General.

[Defense counsel]: Well, you can do that on redirect then.

[Trial court]: No, I'm going to let him do it right now and then he can do it in the future if those questions come.

[Defense counsel]: No, sir, we object to that. I don't think it's --

[Trial court]: Well, I'm going to overrule that objection.

At the conclusion of the bench conference, the State made the following statement to the jury: "Your Honor, the State has provided to [defense counsel] every document in the master case file that was provided to us by the police department. We have forwarded that

through discovery and I've had several meetings with [defense counsel] to make sure he has everything." The trial court then added,

> All right. [Defense counsel], it's your decision as to how you want to present the defense in this case, but if you want to show the witness an item that you have in your possession as a result of the discovery and ask him whether or not that's the item that you're referring to, then you can do that, but you don't have to either.

Defense counsel continued with his cross-examination of Inv. Wenger, inquiring again about whether Inv. Wenger had brought the reports with him to court, the location of the reports, and if Inv. Wenger could get access to the reports. The State objected a second time. However, the trial court overruled the objection and instructed the prosecutors not to "interrupt [defense counsel's] cross-examination on that point anymore." Defense counsel continued with his cross-examination. Inv. Wenger testified that he did not have a paper copy of the reports, but that they were "on a website" he could access. Defense counsel then asked Inv. Wenger if the jury or defense counsel could access to the website. At that point, the State objected for a third time. Another bench conference was held, during which the following exchange occurred:

> [Trial court]: Yeah, but you're implying that you don't have the report.
>
> [Defense counsel]: I'm not saying I do or if I don't. I want to know why [Inv. Wenger is] not here prepared for court.
>
> [Prosecutor 2]: He has the report and he's always had the report.
>
> [Defense counsel]: That's not the question, Judge.
>
> [Trial court]: All right.
>
> [Defense counsel]: I have every one of these photographs.
>
> [Trial court]: What I'm going to allow the State, what I'm going to allow the State to do is to --
>
> [Defense counsel]: Just give him their copy of the report.
>
> [Trial court]: When you do that, I'm going to allow the State to stand up and object and say, "Judge, we've provided [defense counsel] with the report."

That's what, that's what I said earlier and I'm going to stick to that, so if you ask the question in that way to insinuate that you don't have the report, I'm going to allow the State to object on that basis.

At the conclusion of the bench conference, the prosecutor made the following statement: "The State's objection is, Your Honor, that we have the report, we've made that report available to [defense counsel] previously. He has access to it as well." Defense counsel objected, stating, "We take exception, Judge, to that comment, because I'm not a witness." Defense counsel then posed the following question to Inv. Wenger, "[T]he attorney general says they gave me a copy of that report, and I understand they have a copy of that report. Can you step off that [witness stand] and get, see what that report says, please . . . if they'll allow you to see your report." The State objected on procedural grounds to having the witness step off the witness stand to retrieve the report from the prosecutors.

Inv. Wenger was eventually given a copy of the TBI report regarding the serology and DNA testing done on the two shirts found in the back of the Defendant's SUV and defense counsel cross-examined Inv. Wenger about the contents of the report. The trial court allowed defense counsel to question Inv. Wenger about the results of the TBI analysis despite the fact that Inv. Wenger was not an expert in forensic science, serology, or DNA analysis. Later, the report was admitted into evidence when the TBI Special Agent who had conducted the serology and DNA testing testified as an expert witness about the results of the tests. The TBI report regarding the gunshot residue tests performed on the shirts was not introduced into evidence at trial and was not included in the appellate record.

When a defendant makes allegations of prosecutorial misconduct on appeal, this Court reviews the record to see "whether such conduct could have affected the verdict to the prejudice of the defendant." State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). In other words, it will be reversible error if the improper comments of the prosecutor were so improper or the argument so inflammatory that it affected the verdict. See State v. Reid, 164 S.W.3d 286, 344 (Tenn. 2005); Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). This court must consider the following five factors on appeal:

"(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see also State v. Goltz, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

Specifically, "the prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Hill, 333 S.W.3d 106, 131 (Tenn. Crim. App. 2010). Put another way, "[i]t is improper to personally attack defense counsel or argue that counsel is attempting to mislead the jury." West v. Bell, 550 F.3d 542, 565 (6th Cir. 2008). Defense counsel did not assert in front of the jury that the State had not provided the TBI reports to him during discovery. Instead, defense counsel was merely attempting to impeach Inv. Wenger by making him appear unprepared for trial. As such, the statements by the prosecutors, which they were instructed by the trial court to make, that they had provided everything to defense counsel and reviewed it with him, did not reflect unfavorably upon defense counsel or imply that defense counsel was attempting to mislead the jury. Furthermore, the trial court instructed defense counsel in front of the jury that it was his "decision as to how [he] want[ed] to present the defense in this case" and that he did not have to present Inv. Wenger with anything provided to him in discovery if he did not want to. Given this, we cannot conclude that the prosecutors's comments were so improper or so inflammatory that they affected the verdict. Accordingly, we conclude that this issue has no merit.

*VII. Defendant's Opinion of Local Nightclub*

The Defendant contends that the trial court erred by not allowing him to testify regarding his opinion of a local nightclub. The Defendant's entire argument regarding this issue is as follows: "By denying the Appellant the ability to testify about the Fireside Lodge, including the type of place it is and the type of clientele it attracts, the trial court hindered trial counsel's ability to present [his] theory of the case." The State responds that the Defendant has waived this issue by failing to support his contention with argument, citation to legal authorities, or appropriate references to the record.

During the Defendant's testimony, the following exchange occurred:

[Defense counsel]: Well, do you think everybody that goes to the lounge is a bad person?

[Defendant]: No, sir.

[Defense counsel]: You think everybody who --

[The State]: Objection, Your Honor, speculation.

[Trial court]: Yeah, sustained.

[Defense counsel]: Well, it's an opinion. I'm not asking --

[Trial court]: Sustained.

[Defense counsel]: -- what he's speculating about.

[Trial court]: Sustained.

We agree with the State that the Defendant has waived full appellate review of this issue. The Defendant has failed to support his contention with any argument beyond the conclusory one-sentence statement provided above. Additionally, the Defendant has failed to supply any citation to legal authority or to the record to support his contention. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Due to the Defendant's waiver of this issue, we examine the issue solely to determine whether plain error review is appropriate.

Plain error review is not warranted because the Defendant has failed to show that consideration of the error is necessary to do substantial justice or that a substantial right was adversely affected. Page, 184 S.W.3d at 230-31. The Defendant and Mr. Mitchell both testified that Mr. Lane and several men "ganged" the Defendant at the nightclub a few days before the shooting. Both men also testified to their belief that Mr. Lane was a gang member. Defense counsel repeatedly insinuated and accused Mr. Lane of gang membership throughout the trial. As such, there is no evidence in the record that the trial court's denying the Defendant the opportunity to testify regarding his opinion of the nightclub hindered the presentation of his claims regarding Mr. Lane and self-defense. Accordingly, we conclude that this issue is devoid of merit.

*VIII. Mr. Lane's Prior Inconsistent Statements*

The Defendant contends that the trial court erred by not allowing him to introduce extrinsic evidence of prior inconsistent statements made by the victim. The Defendant does not identify in his brief what the alleged prior inconsistent statements were, but he argues that "[a]llowing such evidence to be presented may have resulted in a different judgment based on the case." The State responds that the trial court allowed defense counsel to question a

-23-

police officer about the only alleged inconsistent statement made by Mr. Lane that was identified by defense counsel at trial.

Defense counsel cross-examined Mr. Lane about his statement to the police and attempted to establish that parts of Mr. Lane's trial testimony were inconsistent with his statement to the police. The major inconsistency explored was that Mr. Lane testified at trial that the Defendant beat him with the gun, but told the police that he did not feel or see a gun when the Defendant attacked him after the shooting. However, at no point during the cross-examination of Mr. Lane did defense counsel attempt to introduce his statement to the police as extrinsic evidence to establish the inconsistency.

Later, defense counsel questioned Inv. Wenger about the Defendant's statement. The State objected, and there was a lengthy discussion regarding when extrinsic evidence of a prior inconsistent statement may be admitted. Defense counsel alleged that Mr. Lane "made many" inconsistent statements, but he was ultimately only able to identify one inconsistent statement, Mr. Lane's statement that he did not feel or see a gun while the Defendant beat him. The trial court allowed defense counsel to question Inv. Wenger about that statement because defense counsel had asked Mr. Lane about the statement on cross-examination and Mr. Lane denied making the statement.

The Defendant has waived full appellate review of this issue. The Defendant has failed to support his contention with any argument beyond a brief conclusory paragraph. Additionally, the Defendant has failed to supply any citation to legal authority or to the record to support his contention. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Due to the Defendant's waiver of this issue, we once again examine the issue solely to determine whether plain error review is appropriate.

Plain error review is not warranted because the Defendant has failed to show that consideration of the error is necessary to do substantial justice or that a substantial right was adversely affected. Page, 184 S.W.3d at 230-31. Again, the Defendant has failed to state with any specificity exactly which inconsistent statements he was not allowed to present to the jury. Mr. Lane's statement to the police was not included in the appellate record for our review. Defense counsel cross-examined Mr. Lane about his statement to the police, and Mr. Lane agreed to making some of the statements in the police report. Defense counsel was allowed to question Inv. Wenger about the only inconsistency identified at trial. Accordingly, we conclude that this issue is without merit.

*IX. Newly Discovered Evidence*

-24-

The Defendant contends that the trial court erred by denying his motion for a new trial on the grounds that the victim recanted a portion of his trial testimony. The Defendant asserts that sometime after the trial, Mr. Lane stated in phone calls recorded by the Hamilton County jail that he and several other men "jumped" the Defendant at a local nightclub a few days before the shooting. The Defendant argues that this evidence "would have changed the mindset of the jury and resulted in a verdict on one of the lesser[-included] crimes detailed in the jury instructions." The State responds that Mr. Lane did not recant his trial testimony.

At the motion for new trial hearing, the Defendant's cellmate, Unjolee Moore, testified that he was also a friend of Mr. Lane's and spoke to him regularly. Mr. Moore admitted that he had "several cases" pending and that he was currently incarcerated for felony murder. Mr. Moore claimed that Mr. Lane was second-in-command of the Five Deuce Blood Stone Villain gang. Mr. Moore further claimed that it was "common knowledge" that Mr. Lane carried a pair of brass knuckles. Mr. Moore testified that Mr. Lane told him on several occasions that he and at least six of his fellow gang members attacked the Defendant outside of a nightclub a few days before the shooting. Mr. Moore further claimed that Mr. Lane said that the prosecutor told "him what to say and what not to say to get a conviction." Mr. Moore testified that on one occasion he called Mr. Lane from jail, that the phone call was recorded, and that Mr. Lane admitted that he and his fellow gang members "jumped" the Defendant. However, the Defendant did not enter the recording into evidence at the motion for new trial hearing, and it was not included in the appellate record.

Mr. Lane testified at the motion for new trial hearing. At the hearing, Mr. Lane reiterated his testimony from the trial that the fight at the nightclub was "[j]ust [a] one-on-one fight" between himself and the Defendant and that he did not use a pair of brass knuckles when he punched the Defendant that night. Mr. Lane also denied knowing or speaking to Mr. Moore. Mr. Lane further denied being in a gang or knowing the people Mr. Moore testified were in the gang with Mr. Lane. At the conclusion of Mr. Lane's testimony, defense counsel informed the trial court that the Defendant was withdrawing his "argument on the recanted testimony" and relying on the other grounds listed in his motion for new trial.

A new trial will be granted on the basis of newly discovered evidence only when a defendant has established the following: "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial." State v. Caldwell, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). The decision to grant or deny a new trial on the basis of newly discovered evidence "rests within the sound discretion" of the trial court. Id. at 117.

This court has previously held as follows:

When it appears that the newly discovered evidence can have no other effect than to "discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness," the trial court should not order a new trial "unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing that a different result at trial would necessarily follow."

Caldwell, 977 S.W.2d at 117 (quoting State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985)).

We agree with the State that the Defendant failed to show that Mr. Lane recanted his testimony. Instead, the only newly discovered evidence presented at the motion for new trial hearing was Mr. Moore's testimony that Mr. Lane had told him that he and several fellow gang members "jumped" the Defendant at a local nightclub a few days before the shooting. However, Mr. Moore's testimony would be inadmissible at trial as hearsay. See Tenn. R. Evid. 802. More importantly, Mr. Moore's testimony was not "so strong and convincing that a different result at trial would necessarily follow." Caldwell, 977 S.W.2d at 117. Mr. Moore admitted that he was facing "several charges," including felony murder, and that he was the Defendant's cellmate, while Mr. Lane testified consistently with his trial testimony. Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion for new trial on the basis of newly discovered evidence.

*X. Ineffective Assistance of Trial Counsel*

The Defendant contends that he received ineffective assistance from his trial counsel. Specifically, the Defendant argues that trial counsel was ineffective for failing to file any pre-trial motions. The State responds that this issue is waived because the Defendant raised it for the first time on appeal and failed to include it in his motion for new trial.

As we have previously stated, issues raised for the first time on appeal are generally waived. Alvarado, 961 S.W.2d at 153. Likewise, the Defendant failed to include this issue in his motion for new trial. See Tenn. R. App. P. 3(e) (stating that "no issue presented for review shall be predicated [on] . . . [a] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial"). Accordingly, the Defendant has waived full appellate review of this issue. Due to this waiver, we examine the issue solely to determine whether plain error review is appropriate.

Plain error review is not warranted on this issue because the Defendant has failed to establish that he did not waive the issue for tactical reasons. Page, 184 S.W.3d at 230. This

court has repeatedly noted that "the practice of raising ineffective assistance of counsel claims on direct appeal is 'fraught with peril' since it 'is virtually impossible to demonstrate prejudice as required' without an evidentiary hearing." State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (citation omitted). This is because once raised and adjudicated during the pendency of the conviction proceeding, such as in a motion for new trial or for Rule 32(f) relief or on direct appeal, a claim of ineffective assistance of counsel may be deemed previously determined for purposes of later post-conviction relief. Tenn. Code Ann. § 40-30-106(h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing."); Tenn. Code Ann. § 40-30-106(f) ("If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed."). Given such risks, we believe that the Defendant waived this issue for the sound tactical reason of preserving his claims of ineffective assistance of counsel for full post-conviction review. Accordingly, we conclude that this issue is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE